**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
NOVEMBER 18, 2021

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
NOVEMBER 18, 2021

*E. Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Determination of the Rights to the Use of the Surface Waters of the Yakima River Drainage Basin, in Accordance with the Provisions of Chapter 90.03, Revised Code of Washington, | No. 99373-4 <br><br> En Banc |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, | |
| Respondent, <br> v. | Filed: <u>November 18, 2021</u> |
| JAMES J. ACQUAVELLA et al., | |
| Appellants. | |

WHITENER, J.—This case presents the culmination of the fight for surface water rights that arguably began in 1855 with the Yakama Nation treaty that reserved water rights for the Yakama Nation. Since then, there have been multiple cases that purport to (at least partially) adjudicate and reserve water rights of various parties throughout the Yakima River Drainage Basin (the Basin). Some of the present parties have litigated these water rights in both federal and state court. The current

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

litigation began in 1977 when the Washington State Department of Ecology filed a general water rights adjudication for all waters contained within the Basin. The Yakima County Superior Court divided the Basin into multiple distinct subbasins and issued conditional final orders (CFOs) for each subbasin at various points within the litigation. The superior court issued its final decree in May 2019, incorporating all of the prior CFOs as necessary. Multiple parties appealed the final decree, and, after briefing was received, Division Three of the Court of Appeals certified the case to this court.

The current appeal contains what can be categorized as three separate appeals, each seeking to modify the trial court's final decree (or the incorporations of the CFOs within). Although each distinct appeal is unrelated as to the disputed issues, some parties have an interest in more than one appeal. Further, all three appeals are tied together by slight variations on one common procedural gatekeeping issue: the appealability of CFOs and how that relates to an appeal of the final decree.

Overall, we reverse the superior court in part and affirm in part, as follows. We hold that RAP 2.2(d) and CR 54(b), which govern the appealability of a partial final judgment in a case with multiple parties, are permissive rules and that a failure to appeal from an order certified for appeal under these rules does not preclude an appeal from the final judgment. In addition, res judicata does not bar Ahtanum Irrigation District (AID) from appealing issues in the final decree. Further, we hold

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

that the Yakama Nation, the Yakama Reservation Irrigation District (YRID), and the United States are appealing a conflict between a prior order and the final judgment in this case. Accordingly, we hold that all three appeals in this case are timely and reach the merits of the issues presented.

We accept the concession of Ecology and reverse the superior court's acreage limits on the Yakama Nation's specified water rights and remand to strike the limits. Further, given that no party opposes the merits, we reverse the superior court's calculation of Rattlesnake Ditch Association's (RDA) members' water rights and remand to recalculate the members' water rights using the expert testimony as set forth in RDA's opening brief. We affirm the superior court's holding that AID may not open the headgates at Bachelor Creek and Hatton Creek for nondiversionary stockwater or to rehydrate the creeks. However, we hold that AID does have a nondiversionary stockwater right to the natural waters at Bachelor and Hatton Creeks from Ahtanum Creek outside of irrigation season. However, because this right is junior to the water rights of the Yakama Nation, it may be exercised only in the unlikely event that the Yakama Nation is not making beneficial use of all the waters of Ahtanum Creek. Finally, we affirm the superior court's holding that AID's

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

water duty was adjudicated in the federal *Ahtanum*[1] cases and affirm the superior court's denial of conveyance loss water, as conveyance loss is part of water duty.

Due to the lengthy litigation and the large number of parties in this case, a brief history of the *Acquavella* litigation and an overview of each of the three appeals, including the parties and issues presented, is instructive in understanding the issues presented in this case.

A BRIEF HISTORY OF THE *ACQUAVELLA* LITIGATION

As a whole, this case concerns the litigation surrounding the water rights in the Basin. "By way of geographic orientation, the Yakima River is a tributary of the Columbia River, commencing at the crest of the Cascade Range near Snoqualmie Pass and generally flowing southeasterly for 175 miles before emptying into the Columbia." *In re Yakima River Drainage Basin*, 177 Wn.2d 299, 305, 296 P.3d 835 (2013) (*Acquavella* V).

In 1977, Ecology initiated a general adjudication pursuant to chapter 90.03 RCW to determine the priority of water rights held within the Basin. "A general adjudication, pursuant to RCW 90.03, is a process whereby all those claiming the right to use waters of a river or stream are joined in a single action to determine water rights and priorities between claimants." *Dep't of Ecology v. Acquavella*, 100

---

[1] *United States v. Ahtanum Irrig. Dist.*, 236 F.2d 321 (9th Cir. 1956) (*Ahtanum* I); *United States v. Ahtanum Irrig. Dist.*, 330 F.2d 897 (9th Cir. 1964) (*Ahtanum* II).

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

Wn.2d 651, 652, 674 P.2d 160 (1983) (*Acquavella* I). "It is akin [to] a quiet title action." *Acquavella* V, 177 Wn.2d at 306. By 1981 this included over 2100 claimants, although only a handful are parties to this appeal.

Pursuant to RCW 90.03.160, the Yakima County Superior Court appointed a referee to assist the court in evaluating the claims. The referee set forth the process for each interested party to submit their claim to water rights within the Basin. The court divided the adjudication into multiple subbasins and divided the water rights at issue into four procedural pathways:

"1. Federal reserved rights for Indian claims.
"2. Federal reserved rights for non-Indian claims.
"3. State-based rights of major claimants.
"4. State-based rights for other claimants, by subbasin."

*Dep't of Ecology v. Yakima Reservation Irrig. Dist.*, 121 Wn.2d 257, 262, 850 P.2d 1306 (1993) (*Acquavella* II).

Throughout this case, there have been various appeals decided: four by this court and one by Division Three of the Court of Appeals. In *Acquavella* I, we held that "under the special circumstances of this case the notice provided by [Ecology] was adequate to meet constitutional due process requirements." 100 Wn.2d at 659. In *Acquavella* II, we addressed multiple issues related to the Yakama Nation and whether some congressional acts limited the Yakama Nation's water rights. 121 Wn.2d at 272-73. In *Department of Ecology v. Acquavella*, 131 Wn.2d 746, 750, 935 P.2d 595 (1997) (*Acquavella* III), we addressed the superior court's award of

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

water rights to the Yakima-Tieton Irrigation District. In *Department of Ecology v. Acquavella*, 112 Wn. App. 729, 732, 51 P.3d 800 (2002) (*Acquavella* IV), Division Three of the Court of Appeals examined res judicata as it related to the denial of water rights to a party that did not assert its rights in a previous adjudication. Finally, in *Acquavella* V, this court addressed many discrete issues affecting the Ahtanum Subbasin. 177 Wn.2d at 304. Significant to the present appeal, we held that the federal *Ahtanum* litigation was a water rights adjudication that is binding on this litigation. *Id*. at 326-29.

On May 19, 2019, the superior court issued its final decree, which incorporated all previous CFOs and included the final schedule of water rights (FSOR). Five parties timely appealed, as will be described below. This case presents the first time that the *Acquavella* litigation has had an appeal from the final decree. Division Three of the Court of Appeals certified the case to this court. Washington State Supreme Court Commissioner Michael Johnston accepted certification.

THE THREE APPEALS, PARTIES, AND ISSUES PRESENTED

1. *The Yakama Nation Appeal: Yakama Nation, YRID, and the United States versus Ecology*

The first appeal concerns the acreage limits to the Yakama Nation's water rights in the Wapato Irrigation Project (Project) contained within the FSOR in the

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

final decree. The United States is a party in this case by way of the McCarran Amendment[2] and acts as trustee to the Yakama Nation.

Both the Yakama Nation and the United States have filed briefing seeking reversal of the limits in the FSOR. YRID has filed briefing joining in the Yakama Nation's brief. The Yakama Nation and the United States are *not* challenging the *amount* of water the Yakama Nation received under the final decree. They challenge the acreage limits to how much land they can irrigate with said water within the Project. They argue that the allocation of water within the Project is a duty of the United States Bureau of Indian Affairs (BIA) and, therefore, is controlled by federal law and that the state court cannot limit that use.

Not only does no one dispute the Yakama Nation's and the United States' view of the law, Ecology is the only party to file a response brief and it *explicitly agrees* with their interpretation of the law. *See* Ecology's Resp. Br. to Yakama Nation, U.S., and YRID at 4-6. However, in the interest of "fairness," Ecology believes that these parties needed to appeal the acreage limitation under the applicable CFO, which the superior court indicated was appealable under RAP 2.2(d). *Id*. at 4.

In its reply, the United States notes that its assignments of error are not dependent on the appealability of the CFO issues as the FSOR contains acreage

---

[2] 43 U.S.C. § 666.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

limits that are not contained within the CFO. Therefore, it could not have appealed

the issue in 1996. However, the United States also contends in the alternative that

CFO issues *are* appealable in the final decree, as RAP 2.2(d) states, "[A]n appeal

*may* be taken from a final judgment that does not dispose of all the claims or counts

as to all the parties." (Emphasis added.) Because "may" is not mandatory language,

parties *can* wait until the final decree to appeal. The Yakama Nation's reply

arguments are similar.

2. *The RDA Appeal: RDA and its members[3] versus Ecology (and previously, but no longer, the Inouyes)*

The first appeal in this case concerns the calculation of the water duty[4] of

RDA and its members. RDA presents six different issues in its opening brief. Four

issues relate to issues of Robert and Carol Inouye's water rights. Since the initial

briefing at the Court of Appeals, RDA and the Inouyes have settled and filed a joint

motion to dismiss those four issues from review.

---

[3] The RDA members include "Justin and Alyssa Briscoe, George and Janin Cameron, Marty Ebert, John and Peggy Euteneier, [Steve Miller and] Katherine Hanses, Tim and Virginia Hunter, Carla Jaeger and Bill Wentz, Linda King, Keith Morris, and Denny and Darlene Sveen." Appellant RDA's Supplemented Opening Br. at 1.

[4] "[Water duty] [is] that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon. It is not a hard and fast unit of measurement, but is variable according to conditions."

*Dep't of Ecology v. Grimes*, 121 Wn.2d 459, 469, 852 P.2d 1044 (1993) (first alteration in original) (quoting *In re Application for Water Rights of Steffens*, 756 P.2d 1002, 1005-06 (Colo. 1988)).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

The remaining two issues relate to the issue of calculating conveyance losses and the expert testimony of Dr. George Maddox as to this type of calculation. RDA contends that the superior court improperly calculated its members' water duty by failing to include Dr. Maddox's testimony on conveyance losses (or the amount of water lost in transit). RDA contends that this improper calculation means that its members do not receive adequate water to account for the loss and, therefore, are not receiving their full amount of water. This issue is not disputed nor is it challenged on the merits by any party.

Ecology did file a response brief asserting that RDA needed to appeal this issue in their subbasin's CFO and that the current appeal is untimely and prejudicial to other parties. Accordingly, the issues relevant to resolve the RDA Appeal are whether an appealable CFO *must* be appealed, whether an appellant may wait until entry of the final decree to appeal terms of a CFO, and whether the CFO is appealable as a final judgment.

3. *The Ahtanum Appeal: AID versus Yakama Nation (including a cross appeal), United States, and Ecology*

AID contends that the superior court erred by (1) limiting AIDs patrons' access to nondiversionary stockwater[5] by improperly characterizing Bachelor and

___

[5] "Nondiversionary stockwater" is naturally occurring water that is not diverted by human efforts from another water source and from which livestock drink directly. *See* Clerk's Papers (CP) at 2095-96.

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Hatton Creeks (which both break off from Ahtanum Creek) as irrigation canals, (2) curtailing natural flows to the creeks by requiring AID to close the headgate[6] outside of irrigation season, (3) limiting AID's water duty, and (4) denying AID's claim for conveyance water by improperly determining conveyance waste.

Like the other appeals, Ecology again argues that AID's appeal is untimely. However, in this case Ecology also contends that res judicata precludes the appeal as it is a collateral attack on the previous CFO that AID did appeal.

AID argues that the superior court erred in not allowing AID to open the headgates at Bachelor and Hatton Creeks outside of irrigation season to gain more natural water flow. Br. for Appellant AID at 11. AID contends that in having a right to nondiversionary stockwater, it has the right to all natural flows, without the headgates, and that the users in 1908 did not have headgates. *Id.* Further, the headgates require AID to use some of its irrigation water to rehydrate the creeks during the irrigation season. *Id.* at 13.

However, the Yakama Nation and the United States argue that AID is not permitted to open the headgates outside of the irrigation season for many reasons. First, they argue Yakama Nation has a right to *all* of the water in the Ahtanum Creek outside of irrigation season under *Ahtanum* II. Therefore, any waters diverted into

---

[6] A "headgate" is a human-made gate that can be opened or closed to control the flow of water for irrigation. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1042 (2002).

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

Bachelor and Hatton Creeks would take away from the Yakama Nation's water. U.S.' Br. in Resp. to AID at 27. Further, the Yakama Nation's right to the water is senior to AID's alleged right to nondiversionary stockwater and, thus, takes priority. *Id*. at 30-33. Also, they contend that the addition of the headgates transformed the creeks that were naturally occurring, into creeks that require human intervention to divert the formerly naturally occurring water into the Bachelor and Hatton Creeks. Yakama Nation's Resp./Cross-Appeal Br. to AID at 18-21. The superior court thus found that the creeks function as irrigation channels and that AID is no longer entitled to nondiversionary stockwater, except for that flow that occurs when the headgates are closed. *Id*. at 21, 24. In addition, the Yakama Nation argues that the superior court found that AID did not present evidence that there was a preirrigation season right to rehydrate the creeks. *Id*. at 34-35. Without this beneficial use, the water right is lost. *Id*. at 35. Finally, *Ahtanum* II precludes diverting water, and the Yakama Nation contends this applies outside of irrigation season, and not just from July 10 to the end of the season. *Id*. at 36. The Yakama Nation has also filed a cross appeal on this issue.

As to water duty, AID argues the superior court erred in holding that the issue of water duty had already been decided in the federal *Ahtanum* litigation because it did not have notice that water duty was going to be litigated at the Ninth Circuit Court of Appeals. Br. for Appellant AID at 15. In contrast, the Yakama Nation

11

argues that *Ahtanum* did rule on water duty and that *Acquavella* V confirmed that the case was an adjudication of water rights. Further, the United States argues that AID *did* have the opportunity to litigate during the Ninth Circuit proceedings but chose not to, and that the prior litigation is binding. U.S.' Br. in Resp. to AID at 46-48.

In addition, AID also argues that it is entitled to conveyance loss water because other irrigation districts were allowed conveyance loss water. Br. for Appellant AID at 14. However, the Yakama Nation argues that conveyance loss and water duty was adjudicated during the *Ahtanum* litigation and that this court cannot change its rulings. Yakama Nation's Resp./Cross-Appeal Br. to AID at 40. The United States argues that AID waived this argument by not presenting it below and that *Ahtanum* II and *Acquavella* V preclude it. U.S.' Br. in Resp. to AID at 43.

ISSUES AND SHORT ANSWERS

1. *Whether the present appeals are timely when the appealing parties either did not appeal the CFO when it was issued or appealed different issues when the CFO was issued?* [Short answer—yes, all three appeals are timely. The use of the word "may" in RAP 2.2(d) is permissive and not mandatory. In addition, the Yakama Nation Appeal concerns an issue of a conflict between the final decree/FSOR and the CFO, and therefore, the issue did not exist at the time the CFO was issued.]

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

2. *Whether the trial court erred when it imposed acreage limits on the amount of land that the Yakama Nation may irrigate with its set amount of water, once that water has been diverted to the Project?* [Short answer—yes. No one contests this issue, and Ecology concedes this issue.]

3. *Whether the trial court erred in calculating the conveyance water of the RDA members?* [Short answer—yes. No party opposes RDA on the merits of this issue.]

4. *Whether the trial court erred in requiring AID to close the headgates to Bachelor Creek and Hatton Creek outside of irrigation season, curtailing natural water flows to rehydrate the creeks and limiting nondiversionary stockwater?*[7] [Short answer—no. Under *Ahtanum* II and *Acquavella* V, the Yakama Nation has a senior water right to divert *all* flows from Ahtanum Creek outside of irrigation season, and AID sets forth no basis for a water right to rehydrate. However, we hold that Bachelor and Hatton Creeks are natural watercourses such that AID does have a *nondiversionary* stockwater right that is junior to the Yakama Nation's water rights.]

5. *Whether the trial court erred in failing to apply a standard water duty to the Ahtanum Subbasin, limiting the AID patrons' water duty?* [Short answer—no.

---

[7] AID characterizes this as two separate issues, but the United States combines them into one issue because they are so interconnected. We agree with the United States' assessment and treat these two issues as one.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

As noted, in *Acquavella* V we concluded that *Ahtanum* II was a binding adjudication of northside water users' rights. Any issues of water duty calculation should have been raised in *Ahtanum* II.]

6. *Whether the trial court erred in denying AID's claim for conveyance water?* [Short answer—no. Conveyance water is included in water duty, which was adjudicated in *Ahtanum* II.]

SPECIFIC FACTS AND ANALYSIS FOR EACH APPEAL

I. The timeliness of the present appeals

Timeliness is the procedural gateway to the merits of each appeal, and each appeal contains a variation on the issue of the appealability of CFOs in relation to timeliness. Because this section largely concerns the procedural language contained within the CFOs, but not the substance of the CFOs, we recount only facts necessary to assess the timeliness issue. Facts related to the merits of the other issues are found within the discussion of each appeal.

A. Standard of review

The interpretation of a court rule is a question of law this court reviews de novo. *State v. Stump*, 185 Wn.2d 454, 458, 374 P.3d 89 (2016). "Court rules are interpreted in the same manner as statutes. If the rule's meaning is plain on its face, we must give effect to that meaning as an expression of the drafter's intent." *Jafar v. Webb*, 177 Wn.2d 520, 526, 303 P.3d 1042 (2013).

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

> B. The present appeals are timely because an appeal of a CFO certified
> under CR 54(b) and RAP 2.2(d) is permissive and not mandatory

As explained above, the present adjudication has been divided into multiple subbasins and procedural pathways. After reviewing the procedures laid out by the referee, the superior court issued CFOs for each of the subbasins. Relevant to this issue are

- the 1993 CFO for Subbasin No. 16 (Upper Naches) (hereinafter the Upper Naches CFO) (which includes the interests of RDA);

- the 1996 CFO for Yakama Indian Nation Court Claim Nos. 2276 and 7253 (hereinafter the Yakama Nation CFO)[8] (which includes the interests of the Yakama Nation, YRID, and the United States); and

- the 2009 CFO for Subbasin No. 23 (Ahtanum) (hereinafter the Ahtanum CFO) (which includes the interests of AID, the United States, and the Yakama Nation).

Each of these CFOs includes *some* language that indicates the CFO is a final order for the purposes of appeal under RAP 2.2(d). The specific language in the CFOs is, however, not necessary to resolve the interpretation of the language in RAP 2.2(d) and CR 54(b).

---

[8] The Yakama Nation CFO contains a provision that specifically states, "This Order contains no quantification nor expresses any opinion on the Yakama Indian Nation's water right to the flows of Ahtanum Creek. That right shall be quantified in another report specific to that subbasin." CP at 988. That Yakama Nation CFO is also at issue in the present case.

15

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

A court generally must resolve all claims for and against all parties before it enters a final judgment on any part of the case. *Loeffelholz v. Citizens for Leaders with Ethics & Accountability Now*, 119 Wn. App. 665, 693, 82 P.3d 1199 (2004). A final judgment is generally "'the final determination of the rights of the parties in the action.'" *Id.* (quoting CR 54(a)(1)). RAP 2.2(d) and its companion rule, CR 54(b), create an exception. In a case with multiple parties or multiple claims, as is the case here, a party is allowed to appeal from a partial final judgment but only if the final order contains an express determination that there is no just reason for delay, supported by written findings, and an express direction for entry of the judgment. *Fluor Enters., Inc. v. Walter Constr., Ltd.*, 141 Wn. App. 761, 767, 172 P.3d 368 (2007). The goal behind the exception is to *avoid* piecemeal appeals. *Loeffelholz*, 119 Wn. App. at 693.

Specifically, under RAP 2.2(d),

In any case with multiple parties or multiple claims for relief . . . an appeal *may* be taken from a final judgment that does not dispose of all the claims or counts as to all the parties, but *only after an express direction by the trial court for entry of judgment and an express determination in the judgment, supported by written findings, that there is no just reason for delay*. The findings may be made at the time of entry of judgment or thereafter on the court's own motion or on motion of any party. The time for filing notice of appeal begins to run from the entry of the required findings. *In the absence of the required findings, determination and direction*, a judgment that adjudicates less than all the claims or counts, or adjudicates the rights and liabilities of less than all the parties, is subject *only to discretionary review until the entry of a final judgment* adjudicating all the claims, counts, rights, and liabilities of all the parties.

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

(Emphasis added.) Similarly, under CR 54(b),

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross claim, or third party claim, or when multiple parties are involved, the court *may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination in the judgment, supported by written findings, that there is no just reason for delay and upon an express direction for the entry of judgment.* The findings may be made at the time of entry of judgment or thereafter on the courts own motion or on motion of any party. In the absence of such findings, determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

(Emphasis added.)

The most important language from a general procedural gatekeeping perspective is that RAP 2.2(d) states that a party *may* appeal a partial final judgment. It does not *require* a party to appeal. The use of the word "may" is unambiguous and thus afforded its plain and obvious meaning. *See Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Therefore, although the parties may have been *allowed* to appeal the CFOs (and some parties did just that), they were not *required* to in order to appeal the final judgment in this case (the final decree and the FSOR).

Further support for this interpretation can be found in *Fox v. Sunmaster Prods., Inc.*, 115 Wn.2d 498, 798 P.2d 808 (1990). In that case, the defendant,

17

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

Ladder Industries, moved for summary judgment against the Foxes, arguing they could not be held liable for the suit. *Id*. at 499. The court granted the motion. *Id*. Months later, the other defendant, Sunmaster, moved for summary judgment seeking dismissal. *Id*. at 500. The court granted that motion as well. *Id*. After losing a motion for reconsideration, the Foxes appealed both summary judgment orders. *Id*. Ladder Industries moved to dismiss as untimely, as more than 30 days had passed since its summary judgment order was final. *Id*. This court held that although there was a delay, the appeal against Ladder Industries was timely, because the CR 54(b) certification was not proper and, even if it had been, "that would have meant only that the Foxes *could have* appealed immediately." *Id*. at 502.

As to the permissive language of the rules, we reasoned, "RAP 2.2(d) says an appeal 'may be taken' from certain kinds of decisions entered before the case is finally disposed of. The rule 'does not explicitly say what *must* be appealed to avoid loss of the right of review or other prejudice.'" *Id*. at 504 (quoting 2A LEWIS H. ORLAND, WASHINGTON PRACTICE: RULES PRACTICE author's cmts. § 3061, at 432 (3d ed. 1978)). Further, "the rules contemplate that various kinds of decisions— specifically including earlier appealable orders—will be reviewed in the appeal from the final judgment in the case." *Id*. We ultimately held that it "makes no sense to mandate an immediate appeal from a partial final judgment entered under CR 54(b), even though the judgment might qualify as appealable under RAP 2.2(d)" because

18

"[q]uite possibly some subsequent order will render an adverse decision moot, or the party will ultimately prevail on remaining issues or recover against other parties." *Id*. at 505. A party cannot know if subsequent rulings in a multiparty case will affect a partial final judgment or if they will ever need to appeal an adverse ruling. Allowing parties to wait until the final order to appeal prevents "perhaps unnecessary appeals in multiparty and multiclaim cases." *Id*.

Nonetheless Ecology contends, without citing to any authority, that the final decree in this case "does not open the door to collateral attack on every judicial finding that has been made in every CFO by the trial court over the course of this lengthy adjudication." Resp. Br. of Ecology to Opening Br. of RDA at 4-5. In an attempt to support this assertion, Ecology quotes the final decree,

> "The CFOs entered in this action confirm the valid surface water rights in this case, and those rights are integrated in this Final Decree. **Since each water right entered in a CFO was confirmed as of the original date of entry of the CFO**, any future determination of the extent and validity of the water right (including any determination of relinquishment) shall commence from the date of entry of the CFO unless otherwise provided by law . . . ."

*Id*. at 6 (quoting Clerk's Papers (CP) at 570). However, this argument is predicated on a misunderstanding of the trial court's order. The trial court order simply acknowledged that the 1983-2009 CFOs confirmed water rights for purposes of priority and relinquishment against the rest of the world as of the date of entry unless modified within this particular adjudication. It had nothing to do with whether the

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

CFOs were final for purposes of appealability when entered. Therefore, Ecology's contention is not persuasive.

Ecology further argues that because "the several CFOs in this adjudication resolved the merits of the parties' legal claims, often decades ago," the CFOs are final judgments, and the previous *Acquavella* appeals would not have been possible if they were not. *Id*. at 10-11. This contention does not change the language of RAP 2.2(d) that the appeal from the CFO was not mandatory. While some parties chose to appeal the CFOs, no party was *required* to appeal. Further, as RDA emphasizes, this court has held that although this case is broken down into multiple procedural pathways and subbasins, it is "[a] general adjudication, pursuant to RCW 90.03, . . . whereby all those claiming the right to use waters of a river or stream are joined in a single action to determine water rights and priorities between claimants." *Acquavella* I, 100 Wn.2d at 652. Therefore, no CFO determines the merits of all involved parties' claims such that it is a full final judgment.

Ecology also attempts to argue that AID's appeal is barred by the doctrine of res judicata, claiming that this is a collateral attack on the Ahtanum CFO. Resp. Br. of Ecology to Br. for Appellant AID at 5. Ecology claims that res judicata applies because, "[r]es judicata precludes litigation by collateral attack, and generally speaking, a motion raising the same claim filed in a different action constitutes a collateral attack." *Id*. (citing *In re Marriage of Aldrich*, 72 Wn. App. 132, 138, 864

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

P.2d 388 (1993)). Here, AID is not raising the same claim in a different action when it appeals issues in the CFO, rather, AID is appealing *different issues* in the *same action*.

"'The threshold requirement of res judicata is a final judgment on the merits in the prior suit.'" *State v. Stevens County Dist. Court Judge*, 194 Wn.2d 898, 903, 453 P.3d 984 (2019) (quoting *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 865, 93 P.3d 108 (2004)). Ironically, as will be discussed in detail below, AID's appeal *is* partially precluded on the merits because some of the issues raised appear to be a collateral attack on the issues previously decided in *Ahtanum* II. However, Ecology does not argue this (and the United States and the Yakama Nation argue this, without invoking res judicata, by simply arguing that the issues have been previously adjudicated in the Ninth Circuit and are binding under *Acquavella* V).

Accordingly, we hold that RDA's and AID's appeals from the final decree are timely because the appeals from the CFOs were permissive and not mandatory.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

C. The United States, the Yakama Nation, and YRID are appealing an alleged conflict between the CFO and the FSOR[9]

The Yakama Nation Appeal is also timely. The various historical and procedural rulings show the parties raise an issue of a conflict between the Yakama Nation CFO and the FSOR and not an issue found within the Yakama Nation CFO alone. However, because this issue requires extensive facts, and to avoid repetition of those facts, we will address it in the next section while discussing the uncontested acreage limit issue.

II. The Yakama Nation Appeal

The Yakama Nation, the United States, and YRID all contend that the trial court erred when it imposed acreage limits on the Yakama Nation's federal water rights to irrigate land within the Project. This concerns water rights S4-84762-J, S4-84763-J, S4-84754-J, and S4-84755-J. Although the Yakama Nation CFO and the FSOR both indicate that these surface water rights are not subject to state law or oversight, the FSOR nonetheless indicates the specific number of irrigable acres for which the water can be used. *See, e.g.*, CP at 975 (setting out that the S4-84762-J water right is to be used for 72,000 irrigable acres but also that "[t]his water right is

---

[9] We note that the Yakama Nation (and, thus, YRID) does offer an *alternative* argument that if the Yakama Nation CFO *does* set an acreage limit, it was incorrect and should be reversed. *See* Yakama Nation's Opening Br. at 4-5 (assignments of error 4 and 6). The Yakama Nation reiterates that it seeks this court's review of the Yakama Nation CFO "only if the Court does not grant the Nation's appeal of the Schedule of Rights." Yakama Nation's Reply Br. to Ecology's Resp. Brs. at 4. We need not address the appealability of this issue as we agree that the Yakama Nation's request for relief is about a conflict between the Yakama Nation CFO and the FSOR.

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

a federally reserved right and is not subject to state regulation, law or oversight"). Although we accept Ecology's concession on the merits of this appeal, we examine the background facts and procedure for context and to show why this appeal is an appeal from the final decree and FSOR and not from the Yakama Nation CFO.

The Project is located on the Yakama Indian Reservation (Reservation) and is operated by BIA. The Project diverts water from the Yakima River for use on the Reservation's irrigable land. These water rights were reserved by the Yakama Nation when it entered into the 1855 treaty with the United States. *See* 12 Stat. 951 (1855) (Treaty with the Yakama Nation). At the time the Project began construction, it was understood that the Reservation contained approximately 120,000 acres of irrigable land. These were split into approximate 72,000 acres of "A" lands (which would bear no cost to store water) and 48,000 acres of "B" lands (which would bear costs to store water). These acreage limits are found in the FSOR. However, in 1962 the BIA estimated the Project to be more than 136,000 acres of irrigable land (amounting to approximately 79,000 "A" lands and 57,000 "B" lands).

In 1990, the superior court entered partial summary judgment finding that the Yakama Nation did reserve federal water rights in the 1855 treaty. However, it also held that Congress had abrogated some of the water rights and modified priority dates through prior statutes. The partial summary judgment did not indicate how the water was to be allocated once diverted by the Project.

23

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

On appeal, in *Acquavella* II, this court concluded that Congress "intended to abrogate the treaty rights of the [Yakama Nation] by limiting the amount of water to which they were entitled for irrigation and by modifying the priority date with respect to some of that water." 121 Wn.2d at 298. We therefore affirmed the 1990 "Amended Partial Summary Judgment." However, in *Acquavella* II the parties did not ask this court *how* the water could be allocated among the irrigable acreage of the Project (though the court did refer to the 120,000 acre figure in the opinion). *See, e.g.*, 121 Wn.2d at 299.

In the Yakama Nation CFO, the court included a provision that reads,

None of the Yakama Indian Nation's surface water rights in the Yakima Basin are subject to state law or oversight. The allocation of water, once diverted onto the Yakima Indian Reservation at the Wapato Irrigation Project diversion points, remains a duty of the Bureau of Indian Affairs through the Wapato Irrigation Project, subject to the requirements of federal law.

CP at 989. The Yakama Nation did not appeal this CFO.

In contrast to this language in the Yakama Nation CFO, the FSOR limits the use of the water rights to either the 72,000 acres of "A" lands or the 48,000 acres of "B" lands, depending on the specific water right. The United States and the Yakama Nation objected to the draft schedule of rights to the extent that it limited the acreage and thus BIA's ability to allocate water as it sees fit under federal law. Specifically, because there has since been found to be *more* irrigable land than the initial 72,000 acres and 48,000 acres, the limitations on the water rights prevent BIA from

24

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

providing water to that land, although it should have control of the allocation of water once diverted onto the Reservation. Accordingly, the United States and Yakama Nation seek to have the acreage limits removed from the FSOR. Further, this shows that the parties are not appealing the Yakama Nation CFO but, rather, the conflict that arises between the absence of the acreage limits in the CFO with the subsequent acreage limits in the FSOR. We hold that this appeal of the FSOR is timely.

As to the acreage limitations, Ecology agrees and concedes this issue as it did before the trial court. Ecology Resp. Br. to Yakama Nation, U.S., and YRID at 5-6. Ecology agrees and contends that paragraph 9 of the Yakama Nation CFO makes this case factually unique as it indicates the use of the water rights once diverted onto the reservation are not subject to state law oversight, and the allocation of water at the Project is a duty of BIA under federal law. *Id*. Therefore, Ecology concedes that "if, under federal law, additional lands were designated beyond the 120,000 acres confirmed in the CFO, then it would seem that the Nation could serve those lands even if they extend beyond what the court originally confirmed in the 1996 CFO." *Id*.

We accept Ecology's concession and remand to the superior court to strike the acreage limitations in the FSOR and reiterate that federal law governs how diverted water may be allocated within the Project.

25

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

III.    The RDA Appeal

Rattlesnake Ditch is an approximately two-mile-long, unnatural watercourse from which RDA members divert water for their properties. Its water is diverted from Rattlesnake Creek, a tributary of the Naches River. Members use the water from Rattlesnake Ditch for many reasons, including irrigation and stockwater.

RDA is located in the Upper Naches Subbasin, or Subbasin 16. The referee held multiple evidentiary hearings for the Upper Naches Subbasin between March 30, 1987 and March 22, 1989. CP at 132-33 (Report of Referee Re: Subbasin No. 16). The referee then submitted his report, which included his determination of water rights in the Upper Naches Subbasin. As to irrigation, the referee concluded that "for each irrigated acre, the Referee calculates the maximum instantaneous rate of diversion to be 0.02 cubic foot per second [(cfs)] (9 gallons per minute)." *Id*. at 135 (Report of Referee Re: Subbasin No. 16). However, he also noted that claimants that use ditches for delivery of water to their property, as RDA's members do, "require[] the diversion of additional water for transportation in the ditch and conveyance loss." *Id*. In addition the referee noted that during the evidentiary hearings, Ecology and most of the claimants, including RDA, did not provide expert testimony concerning conveyance loss nor "any specific testimony concerning their ditch and the need for conveyance water." *Id*. The only expert who testified was Dr. Maddox, on behalf of the Nile Ditch Association. He testified about conveyance loss in the Nile Ditch. In

26

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

the absence of specific testimony of conveyance loss for the other ditches, "the Referee [chose] to extrapolate Dr. Maddox's testimony to the other ditches being used in the subbasin." *Id*. at 135, 233.

> As to the Nile Ditch, Dr. Maddox testified that
>
> 0.02 cubic foot per second per acre irrigated was the maximum that could be applied to the land and that it would take a diversion of 0.033 cubic foot per second per acre at the headworks in order to get that much water through the ditch system to the land, indicating a 60 percent loss in the one and a half mile long ditch.[10]

*Id*. at 233. Accordingly, users diverting their water from a ditch of that size would need their water duty increased in order to account for the loss. Specifically, in order to get 0.02 cfs/acre to the property in question, one must be allowed a water right for 0.033 cfs/acre to account for the water lost in transit. Therefore, the calculation of the cubic feet of water under the water rights is the number of irrigable acres multiplied by 0.033 cfs.

According to the report, Ecology recommended that the referee confirm the members' water rights. However, the members took exception "as it related to the quantity of water allocated for irrigation purposes and asked that their recommendations be amended to reflect the quantities of water testified to by expert

---

[10] RDA notes that the Rattlesnake Ditch is approximately two miles long, and so it would theoretically have even more conveyance loss than the Nile Ditch. Because Dr. Maddox is the only expert who testified, even applying his calculation correctly results in an underestimate for RDA and its members, but less so than not applying the calculation at all.

27

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

witnesses on the first day of the hearing." *Id*. at 264. Ecology then proposed the quantities of water be modified to account for the expert testimony and filed an order modifying its recommendation. The referee adopted the recommendation of Ecology and recommended the court confirm the rights. The recommended rights are those set forth in Ecology's modified report.

RDA and its members did not file exceptions to the referee's recommendations. On April 8, 1993, after the court settled other issues unrelated to this appeal, it entered the Upper Naches CFO. The CFO confirmed all of the water rights recommended by the referee in the original report for the subbasin and the supplemental report, which included recommendations after exceptions. As noted above, RDA did not appeal then but, instead, waited until the court filed its final decree in May 2019.

RDA and its members dispute the calculation of water rights and the failure to account for conveyance loss. The members contend that the referee did not apply Dr. Maddox's testimony and that their water rights should have been calculated as follows:

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

| Water Right Holder | | Land | Irrigation | | Stock | | Conveyance CFS | | |
|---|---|---|---|---|---|---|---|---|---|
| Certificate No. | Member | Acres | CFS | Acre-Ft/Yr | CFS | Acre-Ft | Awarded by Court | Maddox Equation | Differ-ence |
| S4-83378-J | Hunters | 18 | 0.36 | 54 | 0.01 | 1 | 0.004 | 0.234 | 0.23 |
| S4-83380-J | Briscoes, King, and Hanses and Miller | 20 | 0.4 | 60 | 0 | 0 | 0.16 | 0.26 | 0.1 |
| S4-83381-J | Camerons | 2 | 0.04 | 6 | 0.01 | 1 | 0.016 | 0.026 | 0.01 |
| S4-83382-J | Euteneiers | 13 | 0.26 | 39 | 0.01 | 1 | 0.0044 | 0.169 | 0.1646 |
| S4-83383-J | Morris | 25 | 0.5 | 75 | 0 | 0 | 0.2 | 0.325 | 0.125 |
| S4-83384-J | Sveens | 4.5 | 0.09 | 13.5 | 0.01 | 1 | 0.036 | 0.0585 | 0.0225 |
| S4-83385-J | Camerons, Ebert, Jaeger and Wentz, Sveens | 37 | 0.74 | 111 | 0.01 | 1 | 0.296 | 0.481 | 0.185 |
| S4-83386-J | Camerons | 2 | 0.04 | 6 | 0.01 | 1 | 0.016 | 0.026 | 0.01 |
| Total Additional Amount Owed to the Association for Conveyance Loss | | | | | | | | | 0.8471 |

Appellant RDA's Supplemented Opening Br. at 22. No party has filed any briefing disputing this issue or RDA's calculations.

RDA relies on a previous case within this litigation, *Acquavella* V, in asking this court to remand to correct its members' water rights. In that case, the superior court similarly issued a report, heard exceptions, took more evidence, issued a supplemental report, heard more exceptions, and issued a CFO. *Acquavella* V, 177 Wn.2d at 308. On appeal, AID argued that the superior court "made a mistake in failing to confirm a water right to the Chancery in the 2009 CFO." *Id*. at 348-49. This court concluded that the parcel at issue "appear[ed] to have met the trial court's

29

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

requirements to be confirmed a water right" and "there is no evidence the trial court found any reason not to confirm a right to all the parcels held by the Chancery." *Id.* at 349. We agreed that it is likely the superior court made a clerical error. *Id.*

The United States argued that because the omission occurred in the supplemental report and AID and the Chancery did not act to correct the omission, RAP 2.5(a) should prevent review. *Id.* However, this court held,

> The Rules of Appellate Procedure are flexible to allow for the fair administration of justice. This was an enormous adjudication, involving thousands of parties. In this instance, we are not inclined to irrevocably punish AID and the Chancery for its oversight, when the trial court made the same oversight. AID asks that we remand to the trial court to correct this error. Br. of AID at 34. Assuming an error did occur, as appears likely, we direct the trial court to correct it on remand.

*Id.*

Similarly, the failure to properly calculate the conveyance loss in the RDA members' water duties has occurred since the original report of the referee. We apply the same reasoning as we did in *Acquavella* V not only as binding precedent but as part of the present litigation. This is an enormous litigation and multiple parties and actors involved did not catch this error: neither Ecology, the referee, the superior court, nor RDA's members. However, all agreed that Dr. Maddox's testimony should be incorporated. Given that no parties have expressed any objection on the merits or demonstrated any tangible prejudice, we remand to the trial court for the error to be corrected.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

IV.    The Ahtanum Appeal

Ahtanum Creek flows along the northside boundary of the Yakama Nation Indian Reservation. At some points Ahtanum Creek splits into other waterways. Of most importance to this appeal are Bachelor Creek and Hatton Creek. AID disputes the trial court's characterization of Bachelor Creek and Hatton Creek as irrigation channels and seeks to open its headgates outside of irrigation season in order to use its alleged nondiversionary stockwater rights. Further, AID asserts that the trial court erred when it denied AID conveyance loss water and did not apply a standard water duty throughout the Ahtanum Subbasin.

The United States and the Yakama Nation disagree and contend, for various reasons, that AID is incorrect. Their main argument is that these issues were litigated and decided in the federal *Ahtanum* cases.

We primarily agree with the United States and the Yakama Nation and hold that because the Yakama Nation has a senior water right, AID is precluded from opening its headgates outside of irrigation season.  We also hold that the trial court erred in categorizing Bachelor and Hatton Creeks as nonnatural watercourses and applying the diversionary stockwater right. In addition, we hold that Bachelor and Hatton Creeks are natural watercourses and that AID has a nondiversionary stockwater right that is junior to the Yakama Nation's senior water right to divert all the waters of Ahtanum Creek. Further, we affirm the superior court's holdings as to

31

conveyance loss and water duty as those issues were litigated in the federal *Ahtanum* cases.

Native Americans have been making beneficial use of the waters in the Yakima River Basin for centuries. In the second half of the 19th century, this country encouraged the settling of Native lands through the policy of "Manifest Destiny." *Acquavella* II, 121 Wn.2d at 266. This stealing of Native lands led to conflicts between settlers and the tribes and, ultimately, led to treaties and the establishment of reservations to resolve the conflicts. *Id.*

In 1855, 14 confederated tribes and bands residing in the Yakima Valley (now collectively the Yakama Nation) signed a treaty with the United States. *Id.*; Treaty with the Yakama, June 9, 1855, 12 Stat. 951. "In reality the [Native Americans] had little choice but to sign the treaties, giving up land in exchange for money. The alternative was continued war and the likely loss of land without any compensation whatsoever." *Acquavella* II, 121 Wn.2d at 266.

> Federal reserved water rights are those rights impliedly reserved in the agreement between an Indian nation and the United States government creating an Indian reservation. Also called *Winters* rights after the case that first recognized them, such rights presume that when a reservation was established by treaty, sufficient water was reserved to meet the present and future needs of the reservation.

*Acquavella* V, 177 Wn.2d at 309 (citing *Winters v. United States,* 207 U.S. 564, 28 S. Ct. 207, 52 L. Ed. 340 (1908); *Acquavella* II, 121 Wn.2d at 274).

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

Although the Yakama Nation has presumed reserved water rights to meet present and future needs of the Reservation from the Treaty with the Yakama Nation under the *Winters* doctrine, some of those rights would later be taken without the consent of the Yakama Nation.

As people settled in the Basin, they needed water and, in 1905, began taking water from the Yakima River. *Acquavella* V, 177 Wn.2d at 312. Soon thereafter, the water was overappropriated, and the United States sought to limit the amount of water use. *Id*. As part of this reclamation effort, in 1908, an agent of the United States (W.H. Code) entered into the "Code Agreement" with many white northside settlers on behalf of the Yakama Nation. *Id*.; *Ahtanum* I, 236 F.2d at 329-30. This agreement gave the northside settlers 75 percent of the flow of Ahtanum Creek and reserved only 25 percent of the waters for the Yakama Nation. *Acquavella* V, 177 Wn.2d at 312; *Ahtanum* I, 236 F.2d at 329-30. An assistant to the secretary of the interior approved the agreement on the secretary's behalf. *Ahtanum* I, 236 F.2d at 329. "The agreement was drawn and signed, not only without consulting the [Yakama Nation], but without legal advice." *Id*. at 337.

In the 1920s, the Yakima County Superior Court later adjudicated water rights for the northside settlers, some of whom signed the Code Agreement. *See State v. Achepol*, 139 Wash. 84, 245 P. 758 (1926). On appeal, this court affirmed the so-called "Achepol Decree." The Yakama Nation and the United States were not parties

33

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

and were not present to challenge the Treaty with the Yakama Nation's reserved rights that had been taken from the Yakama Nation.

In 1947, the United States filed suit in federal court on behalf of the Yakama Nation to quiet title to the Yakama Nation's rights to the waters of Ahtanum Creek and seeking to invalidate the Code Agreement. *Ahtanum* I, 236 F.2d at 323. The trial court dismissed the action, holding that neither the United States as trustee to the Yakama Nation nor the Yakama Nation "had any right, title or interest in any water of Ahtanum Creek." *Id*. Although *Winters* had been the law for decades, the trial court nonetheless held that *no* water rights were reserved by the 1855 treaty. *Id*. at 324. Further, the trial court held that the Code Agreement "gave the white owners nothing that they did not already own." *Id*.

On appeal, the Ninth Circuit held that under *Winters*, the Yakama Nation did, in fact, reserve water rights for the present and future use of the Reservation. *Id*. at 325. In addition, the Ninth Circuit examined the Code Agreement in great detail. It noted that it did not appear that Congress had been apprised of this agreement, as Congress continued to appropriate water to the Reservation's irrigation system. *Id*. at 331-32. It was estimated that the Yakama Nation's irrigation system would need all of the waters of Ahtanum Creek by the year 1915, and so the Ninth Circuit questioned whether the secretary of the Interior could have had the power to give away water rights that the Yakama Nation might need. *Id*. at 337.

34

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

The Ninth Circuit acknowledged how valuable the water rights were to the Yakama Nation and criticized this nation's treatment of Native peoples and the taking of their land and rights. *Id.* It reasoned,

> With an opportunity to study the history of the *Winters* rule, as it has stood now for nearly 50 years, we can readily perceive that the Secretary of the Interior, in acting as he did, improvidently bargained away extremely valuable rights belonging to the [Yakama Nation]. Perhaps the feature of the whole matter most worthy of criticism is the apparent failure of the Secretary, before approving such an arrangement, to obtain legal advice either from the Solicitor or from the Department of Justice, as to the Validity or the advisability of the proposed agreement. Viewing this contract as an improvident disposal of three-fourths of that which justly belonged to the [Yakama Nation], it cannot be said to be out of character with the sort of thing which Congress and the Department of the Interior has been doing throughout the sad history of the Government's dealings with the Indians and the Indian tribes. That history largely supports the statement: "From the very beginnings of this nation, the chief issue around which federal Indian policy has revolved has been, not how to assimilate the Indian nations whose lands we usurped, but how best to transfer Indian lands and resources to non-Indians."

*Id.*

Although noting our nation's history of taking what rightfully belongs to Native Americans, the Ninth Circuit ultimately upheld the Code Agreement noting, "The Secretary's mistakes, his poor judgment, his overlooking or ignoring of the true measure of the [Yakama Nation's] rights, his lack of bargaining skill or determination may add up to an abuse of his power, but do not negative it, or make his act ultra vires." *Id.* at 338.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

However, the court limited the Code Agreement such that "when the needs of those parties to that agreement . . . were such as to require less than the full 75 percent of the waters of the stream, then their rights to the use of the water was correspondingly reduced, and those of the [Yakama Nation], in like measure, greater." *Id*. at 341. Therefore, any rights not "clearly shown to have been granted" under the Code Agreement were reserved by the Yakama Nation. *Id*. The Ninth Circuit remanded to further determine the water rights of the individual northside users, as the Yakama Nation had proved the Reservation needed all of the water. *Id*. at 340-42.

On remand claimants submitted their claims of water use. *Ahtanum* II, 330 F.2d at 900. The trial court concluded that the northside users' rights in the aggregate included 75 percent of streamflow. *Id*. at 904. The Ninth Circuit disagreed and held that the use limitations also included seasonal limitations on the use of the water. *Id*. at 907-08. Thus, when the traditional irrigation season on the northside ended in July, so did the water needs and, accordingly, the water rights. *Id*. at 909. As to the water rights, the Ninth Circuit held,

> It is ordered, adjudged and decreed that the waters of Ahtanum Creek shall be and are hereby divided between the parties to this action in the following manner and at the following times, to-wit:

36

I

From the beginning of each irrigation season, in the spring of each year, to and including the tenth day of July of each such year, said waters shall be divided as follows:

a. To defendants, for use of their lands north of Ahtanum Creek, seventy-five per cent of the natural flow of Ahtanum Creek, as measured at the north and south gauging stations, provided that the total diversion for this purpose shall not exceed 46.96 cubic feet per second, and provided that when the said measured flow exceeds 62.59 cubic feet per second defendants shall have no right to the excess, except in subordination to the higher rights of the plaintiff.

b. To plaintiff, for use of Indian Reservation lands south of Ahtanum Creek, twenty-five per cent of the natural flow of Ahtanum Creek, as measured at the north and south gauging stations; provided that when that natural flow as so measured exceeds 62.59 cubic feet per second, all the excess over that figure is awarded to plaintiff, to the extent that the said water can be put to a beneficial use.

c. Plaintiff may divert such water from the south fork of Ahtanum Creek as can be beneficially used for the individual diversion into the Yakima Indian Reservation lying above the main Bureau of Indian Affairs diversion; provided, however, that the water diverted to such individual diversion shall be charged against and deducted from the overall award set forth in "b" above.

d. To the plaintiff, for the lower Bureau of Indian Affairs diversion, a daily diversion of water representing five per cent of the natural flow of Ahtanum Creek as measured at the north and south fork gauging stations. This award shall represent plaintiff's interest in the return flow of the main stem of Ahtanum Creek, and the award to defendants shall be conditioned upon plaintiff receiving this flow of water at the lower Bureau of Indian Affairs diversion.

e. To defendants, all the rest of the return flow in the main stem of Ahtanum Creek, and all the return flow in Hatton and Batchelor [sic] Creeks.

> f. Any water loss which may occur between the north and south fork gauging stations, and the defendants' Hatton Creek diversion, is to be absorbed by defendants; plaintiff being entitled to its full stated percentage of the measured flow, and defendants taking the balance.

## II

> After the tenth day of July in each year, *all the waters of Ahtanum Creek shall be available to, and subject to diversion by, the plaintiff for use on Indian Reservation lands south of Ahtanum Creek, to the extent that the said water can be put to a beneficial use*.

*Id*. at 915 (emphasis added). This is referred to as the "Pope Decree."

In the present case, the superior court incorporated the Pope Decree into its memoranda and ultimately the Ahtanum CFO. AID appealed some of its issues with the CFO for its subbasin, becoming the basis for *Acquavella* V. In that case, we held that *Ahtanum* II was an adjudication of individual water rights on the northside residents and is binding on the *Acquavella* proceedings. *Acquavella* V, 177 Wn.2d at 326-29. On remand, the court issued an amended CFO. CP at 7531-35. After the court issued its final decree, AID appealed, and the Yakama Nation cross appealed on the stockwater issue of whether AID can divert water from Ahtanum Creek through the headgates outside of irrigation season.

A. AID is not permitted to open its headgates outside of irrigation season because of the Yakama Nation's senior water right to all of the waters of Ahtanum Creek

AID regulates its water from the Ahtanum Creek to the Bachelor and Hatton Creeks through headgates. Over the course of the litigation, there have been many

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

rulings on stockwater, but the issue in the present appeal pertains to nondiversionary

stockwater. In 2002, the superior court ruled in its "Report of the Court Concerning

the Water Rights for the Subbasin No. 23 (Ahtanum Creek)" that

> [w]aters in natural watercourses in the subbasin shall be retained when naturally available, in an amount not to exceed 0.25 cubic feet per second (cfs), for stock water uses in such watercourses as they flow across or are adjacent to lands, which are now used as pasture or range for livestock. Retention of such water shall be deemed senior (or first) in priority, except as that use is inconsistent with the Yakama Nation's instream right for fish which carries a priority date of 'time immemorial,' in which case the Nation's right shall have priority. Regulation of these watercourses by the plaintiff shall be consistent with such retention requirements.

*Id*. at 2095.

Subsequently, after the exceptions briefing, in the "Memorandum Opinion Re:

Ahtanum Creek Threshold Legal Issues," the superior court concluded that *Ahtanum*

II did not resolve the issue of *nondiversionary* stockwater rights and set the issue for

an evidentiary hearing. The court did hold that *diversionary* stockwater rights were

covered by *Ahtanum* II and, thus,

> no diversions for stock watering purposes may be made after July 10 through the end of the irrigation season and any use of water diverted prior to July 10 for stock water purposes must be incidental to irrigation and therefore within, and not in addition to, the quantities confirmed by the Court for irrigation.

*Id*. at 3417.

AID sought to keep the headgates open after July 10 to allow for *natural* flows

through Bachelor and Hatton Creeks and for said flows to be considered

39

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

nondiversionary stockwater. However, the superior court concluded that the use of the headgates made it so that Bachelor and Hatton Creeks were being used as irrigation channels. Further, keeping the gates open would substantially reduce the flow in Ahtanum Creek to the detriment of the Yakama Nation, so the Pope Decree dictated that the headgates remain closed. The court also noted,

> Even though the creeks have been modified to function as irrigation channels, they still are creeks[,] and lands through which the creeks flow are riparian to those creeks and entitled to non-diversionary stock water rights. After the gates are closed, any water that continues to flow in Hatton and Bachelor Creeks is available for non-diversionary stock watering, because no human effort is required to cause that water to be there. Livestock can drink from those creeks if water is available, without the landowner being confirmed a diversionary stock water right.

*Id.* at 6733-34. These rulings were eventually incorporated into the Ahtanum CFO.

When the court issued the Ahtanum CFO, the Yakama Nation appealed the priority date set forth in the nondiversionary stockwater ruling for lack of adequate evidence as the priority date did not include the Yakama Nation's reserved water rights under the 1855 Treaty with the Yakama Nation. The issue was uncontested, and we remanded on this issue for "the entry of findings of fact on the priority dates and further conclusions of law as appropriate." *Acquavella* V, 177 Wn.2d at 305 n.1. On remand, the court amended the nondiversionary stockwater ruling to read,

> "Waters in natural watercourses in the subbasin shall be retained when naturally available, in an amount not to exceed 0.25 cubic feet per second (cfs), for stock water uses in such watercourses as they flow across or are adjacent to lands, which are now used as pasture or range

40

for livestock. Retention of such water shall be deemed senior (or first) in priority, except as that use is inconsistent with the Yakama Nation's instream right for fish which carries a priority date of 'time immemorial' *or as that use is inconsistent with the Yakama Nation's treaty water rights for irrigation which carry a priority date of June 9, 1855, in which case the Nation's rights shall have priority*. Regulation of these watercourses outside of the Yakama Reservation by the plaintiff or, in the case of watercourses on the Yakama Reservation, regulation by the United States Bureau of Indian Affairs or the Yakama Nation shall be consistent with such retention requirements."

CP at 7535 (emphasis added, denoting the language added to the CFO on remand).

AID appealed and argues that the trial court erred when it refused to allow AID to open the headgates at Bachelor and Hatton Creeks outside of irrigation season to allow for natural flows for stockwater and to rehydrate the creeks before irrigation season. The Yakama Nation cross appealed and argues that the trial court erred when it held that *Ahtanum* II does not prevent AID from diverting water from Ahtanum Creek through the headgates "between the end of the irrigation season and April 15 of the next year although AID is barred from diverting after July 10 until April 15." Yakama Nation's Resp./Cross-Appeal Br. to AID at 2. The Yakama Nation and the United States provide multiple arguments as to why AID should be prevented from opening the headgates outside of irrigation season, we discuss each in turn.

### 1. Standard of Review

"Appellate review of the decree shall be in the same manner as in other cases in equity." RCW 90.03.200. "Findings of fact are reviewed under a substantial

41

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

evidence standard, defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). The court defers to the findings of fact below so long as this standard is met. *Id*. "Questions of law and conclusions of law are reviewed de novo." *Id*. at 880.

### 2.  Yakama Nation's senior water right and *Ahtanum* II

We hold that the Yakama Nation has an irrigation water right to the waters of Ahtanum Creek that is senior to all other parties. Under *Ahtanum* II, the Yakama Nation has a right to divert *all* waters of Ahtanum Creek outside of irrigation season and AID is precluded from diverting water after July 10.

AID argues that "neither the *Ahtanum* I nor the *Ahtanum* II decisions addressed water use outside the irrigation season, and neither decision mandates that AID manipulate or constrain natural stream flows." Br. for Appellant AID at 14. This is simply not the case. As discussed, in *Ahtanum* I, the Ninth Circuit first looked to the 1908 Code Agreement, which purported to give 75 percent of flows to the northside users with 25 percent reserved for the Yakama Nation. Although it did affirm that the Code Agreement was binding, in *Ahtanum* II, the Ninth Circuit adjudicated individual water rights. There was no "seasonal limit" to the water rights adjudicated in *Ahtanum* II. The court looked to the testimony on the use to determine when and how the northside users were beneficially using the water, and the court

found that the northside users *beneficially* used the water only during irrigation season. As a result, any time that the northside users were *not* traditionally and beneficially using the waters of Ahtanum Creek (which was found to be all times outside of irrigation season), the right to the waters was still reserved by the Yakama Nation under the 1855 treaty. Accordingly, the Pope Decree indicates that "[a]fter the tenth day of July in each year, *all the waters of Ahtanum Creek shall be available to, and subject to diversion by, the plaintiff for use on Indian Reservation* lands south of Ahtanum Creek, to the extent that the said water can be put to a beneficial use." *Ahtanum* II, 330 F.2d at 915 (emphasis added). Thus, the Ninth Circuit adjudicated the water rights for the entire year, not just irrigation season.

While the Pope Decree may not specifically mandate that *AID* is the one to manipulate or constrain the natural flows of the creeks, it certainly allows for the Yakama Nation to use and divert the water in Ahtanum Creek that would flow down Bachelor and Hatton Creeks were the headgates open outside of irrigation season. There is no reason why the superior court could not require AID to keep the headgates closed in order for the Yakama Nation to take advantage of its water rights.

AID rightfully conceded below, and reiterates its concession here, that the Yakama Nation treaty rights for irrigation are senior to the junior rights of northside

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

users to use nondiversionary stockwater.[11] This senior right is memorialized in the 2019 amended Ahtanum CFO and, therefore, the final decree. "Because junior rights holders take their water rights subject to the rights of senior rights holders, in times of scarcity the junior rights holders suffer first and suffer the most." *Lummi Indian Nation v. State*, 170 Wn.2d 247, 265, 241 P.3d 1220 (2010). Therefore, any junior right to nondiversionary stockwater comes at the expense of the Yakama Nation's senior right.

In its reply, AID agrees that it has a junior right but contends, without citation, that "the junior user may continue to use its water right unless and until the senior water right holder is denied the use of its water." Reply Br. of Appellant AID to Resp. Br. of U.S. & Resp. Br. of Ecology at 2. However, "[j]unior rights holders always take their water rights subject to the risk that there may be no water to fulfill those rights." *Lummi Indian Nation*, 170 Wn.2d at 267.

Further, in this case, any diversion of water through the Bachelor and Hatton headgates would result in the Yakama Nation's diverting less than all the waters of Ahtanum Creek that it can put to beneficial use. Evidence in the record shows that Yakama Nation is "operating on a real thin margin after July 10th." CP at 3797-98. Further, a small diversion of up to 5 cfs would result in "a sizable reduction in

---

[11] In the next section we conclude that AID does have a nondiversionary stockwater right to the natural flows of Bachelor and Hatton Creeks but that this right is junior to the Yakama Nation's senior treaty rights.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

deliveries to our farmers, and it would also make us quit diverting water probably two to four weeks sooner than we do now. On any given year, it's probably going to shorten the season by two to four weeks." *Id*. at 3797. There is simply not enough water in Ahtanum Creek to allow for both AID to open the headgates to exercise a nondiversionary stockwater right and for the Yakama Nation to exercise its senior reserved irrigation rights. Accordingly, we hold that the superior court did not err in requiring AID to keep the headgates closed outside of irrigation season.

In its reply, AID does not challenge this evidence but, instead, pivots to the argument that AID patrons' have a nondiversionary stockwater right "when flows permit" that does not *necessarily* impair the Yakama Nation's senior right. Reply Br. of Appellant AID to Resp. Br. of U.S. & Resp. Br. of Ecology at 3. This is true; however, given the scarcity of the water in this subbasin, it is unlikely that there will be water in Ahtanum Creek in excess of what the Yakama Nation can beneficially use. *See Acquavella* V, 177 Wn.2d at 306 ("In the spring of 1977, meteorologists predicted record drought for the Yakima River Basin," leading to the filing of this water rights adjudication.). Nonetheless, *in theory* it could. Therefore, in the next section, we analyze the issue of nondiversionary stockwater and conclude that AID does have a right to nondiversionary stockwater that is junior to the Yakama Nation's water rights.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

3. Natural watercourse and nondiversionary stockwater

As to the issue of nondiversionary stockwater, the parties also disagree as to whether Bachelor and Hatton Creeks are artificial or natural watercourses. The trial court held that the northside users had a right to nondiversionary stockwater in Bachelor and Hatton Creeks to the extent that there is any natural flow with the headgates closed. Because under *Ahtanum* II there is no right to *diversionary* stockwater outside of irrigation season and because the opening and closing of the headgate requires human effort, the court held that the northside users do not have a right to diversionary stockwater from opening the headgates.

AID argues that the trial court erred when it characterized Bachelor and Hatton Creeks as "artificial water courses."[12] Br. for Appellant AID at 11. It contends that because the water rights were confirmed in 1908 when there were no headgates, they are entitled to natural streams without the headgates. It further contends that the use of headgates does not mean that Bachelor and Hatton Creeks "are no longer natural water courses." *Id*. at 12. AID provides no citation or definition for what a "natural water course" is as opposed to an "artificial" one, and whether the addition of the headgates made the once natural watercourses artificial.

---

[12] Even with AID's citation to the record it is unclear where in the record the trial court referred to the watercourses as "artificial." However, the record does indicate that diverting water now requires human intervention, which will be discussed and which seems to indicate that the court concluded that the watercourses are no longer natural because of the addition of the headgates.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

The Yakama Nation, therefore, contends that AID has failed to show that the trial court was incorrect in its ruling.

Yakama Nation cites to cases that show that *other* means of artificial waterways are diversionary (as opposed to nondiversionary), but not that adding an artificial headgate makes a natural creek artificial. *See, e.g.*, *Pays v. Roseburg*, 123 Wash. 82, 84, 211 P. 750 (1923) (using constructed ditches and flumes to divert water, eliminating former natural flow, was a diversion from original riparian lands). In contrast to irrigation ditches and flumes, which are themselves dug by humans, here, Bachelor and Hatton Creeks are the original riparian lands and part of the geography of the Basin. There is no dispute that they have been artificially modified with headgates for the purposes of irrigation and fish screens to prevent fish from entering the creeks. Bachelor Creek and Hatton Creek both contain headgates where they divert from Ahtanum Creek. Since the Hatton Creek headgate is no longer operational, Ahtanum Creek water is piped to Hatton Creek by way of Bachelor Creek.

When closed, the headgates prevent water from entering Bachelor and Hatton Creeks and instead cause the water to remain in Ahtanum Creek. Because the headgates prevent water from entering Bachelor and Hatton Creeks from Ahtanum Creek, it is logical that flows in the creeks through the open headgates are not a true diversion but instead are the natural flows of Bachelor and Hatton Creeks. However,

47

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

it is also true that to open the headgate and allow for water flows requires human effort (and is thus a diversion under the court's ruling).

The Yakama Nation dedicates briefing to the substantial evidence to support the trial court's ruling, which in this case means proof that water flows by the addition of headgates is not natural, is controlled by human intervention, and is an irrigation channel. *See* Yakama Nation's Resp./Cross-Appeal Br. to AID at 22-25. AID does not address the Yakama Nation in its reply, nor does it seem to address any of these issues in its briefing. But no one is disputing that the headgates themselves are not natural and are controlled by human intervention. Accordingly, the true issue is whether the addition of the headgate makes a previously natural watercourse artificial.

In his treatise, Clesson S. Kinney writes,

> To maintain rights in a [natural] water course it must be a made to appear that the water usually flows in a certain direction and by a regular, natural channel, with a bed, banks, or sides. . . . In its legal sense it consists of a bed, banks, sides, or walls, and a current of water. It is a living stream confined to a channel, usually flowing in a particular direction, and usually discharging itself into some other stream or body of water, but not necessarily flowing all of the time, for there are water courses which are sometimes dry. It is a natural, living stream, and includes rivers, *creeks*, brooks, runs, and rivulets.

1 CLESSON S. KINNEY, A TREATISE ON THE LAW OF IRRIGATION AND WATER RIGHTS, § 301 (2d ed. 1912) (emphasis added) (footnote omitted). Similarly, *Black's Law Dictionary* defines "watercourse" as "[a] body of water, usu[ally] of natural origin,

48

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

flowing in a reasonably definite channel with bed and banks. [ ] The term includes not just rivers and *creeks*, but also springs, lakes, and marshes in which such flowing streams originate or through which they flow." BLACK'S LAW DICTIONARY 1907 (11th ed. 2019) (emphasis added). It defines "natural watercourse" as "[a] watercourse with its origin in the forces of nature." *Id*. We have held that "[a] natural watercourse, insofar as riparian rights be concerned, and as related in appropriate instances to drainage rights, is defined as a channel, having a bed, banks or sides, and a current in which waters, with some regularity, run in a certain direction." *King County v. Boeing Co.*, 62 Wn.2d 545, 550, 384 P.2d 122 (1963). Further, in reference to the creek at issue, in *Rigney v. Tacoma Light & Water Co.*, 9 Wash. 576, 579, 38 P. 147 (1894), we opined,

> From the time of the earliest settlement of the country it has flowed in a definite and easily distinguished channel, and was seldom, perhaps never, dry prior to the commission of the acts complained of.
>
> Having a bed, banks and current[,] *it is a natural water course*, even although it may, at times, be dry.

(Emphasis added.)

Natural watercourses are "distinguished from artificial water courses as being formed entirely by Nature, while artificial watercourses are formed by the works of man." 1 KINNEY, *supra*, § 301. Artificial watercourses

> include all man-made ditches, canals, tunnels, flumes, or other artificial conduits constructed for the purpose of conveying water. They may be constructed for the purpose of conveying water to the place of use, as

49

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

in the case of irrigation; or, upon the other hand, they may be constructed to convey water away from the land, as in the case of drainage. *Their principal characteristic is their entire artificial construction.*

1 KINNEY, *supra*, § 316 (emphasis added).

Similarly, *Black's Law Dictionary* defines an "artificial watercourse" as "[a] man-made watercourse, usu[ally] to be used only temporarily. [] If the watercourse is of a permanent character and has been maintained for a sufficient length of time, it may be considered a natural watercourse to which riparian rights can attach." BLACK'S LAW DICTIONARY 1907 (11th ed. 2019). These definitions refer to the types of artificial watercourses in which the *watercourse itself* is artificial, such as the flumes and ditches in *Pays*, 123 Wash. 82, but not the addition of artificial improvements to control the flow of water in a watercourse created by nature.

We have not previously addressed whether adding a headgate to a natural watercourse changes that watercourse from natural to artificial. However, in *Rigney*, we held that the creek at issue was still a natural watercourse, even though "its channel has been deepened artificially within the last ten or fifteen years for the purpose of draining the swamp from whence it flows." 9 Wash. at 579.

The Supreme Court of Nebraska and the Supreme Court of California have also opined on artificial changes to a natural watercourse, and we look to these courts for further guidance.

50

In *Northport Irrigation District v. Jess*, 215 Neb. 152, 156, 337 N.W.2d 733 (1983), the Supreme Court of Nebraska held that the creek at issue was still a "natural watercourse" even though "a portion of the banks . . . had been repaired." It reasoned, "A natural stream or watercourse does not lose its natural character as such merely by artificial improvements." *Id*. at 156-57 (citing 1 KINNEY, *supra*, § 301). Further, when defining a natural watercourse, the Supreme Court of California opined, "Alterations to a natural watercourse, such as the construction of conduits[13] or other improvements in the bed of the stream, do not affect its status as a 'natural' watercourse." *Locklin v. City of Lafayette*, 7 Cal. 4th 327, 345, 867 P.2d 724, 27 Cal. Rptr. 2d 613 (1994).

While these cases address artificial alterations to the bed and the banks of the stream, it logically follows that artificial improvements to a natural watercourse that in some way help or change the flow do not transform a natural watercourse into an artificial one. Here, the improvements to Bachelor and Hatton Creeks were headgates and a pipe to control the flow of water for the purpose of irrigation. But the creeks *themselves* are not artificial or constructed in the same way that irrigation ditches (such as the Rattlesnake Ditch), flumes, or canals are constructed. While it is true that the headgate requires human intervention and is thus an artificial addition,

---

[13] A "conduit" is "a natural or artificial channel through which water or other fluid passes or is conveyed." WEBSTER'S, *supra*, 474. *Webster's* also lists "pipe" and "aqueduct" as synonyms. *Id*.

51

the creeks themselves, and the natural flows within them without the headgates, are not. When the headgates are open, as would be the natural state of the creeks, the water that flows is not "diverted" from Ahtanum Creek, it flows naturally. While the creeks may function as irrigation channels, the creeks themselves are natural watercourses. This is in line with our own definition of a natural watercourse in *Boeing*, 62 Wn.2d 545.

Accordingly, we hold that AID has a *nondiversionary* stockwater right to the flows of Bachelor and Hatton Creeks with the headgates open. *However*, as discussed, this right is junior to the Yakama Nation's right to divert all waters from Ahtanum Creek. Until and unless the Yakama Nation is no longer making beneficial use of all the waters of Ahtanum Creek outside of irrigation season, AID cannot open the headgates outside of irrigation season to exercise its nondiversionary stockwater right.[14]

4. Rehydrating the creeks prior to irrigation season

AID also contends that it should be allowed to open the headgates to "rehydrate" the creeks because closing the headgates outside of irrigation season

---

[14] AID further argues that refusal to allow AID to open the gates violates chapter 90.22 RCW (the minimum water flows and levels act of 1969). But, as the Yakama Nation succinctly curbs this argument, state law cannot be used to impair federal water rights and the enacted state laws do not affect existing rights. Yakama Nation's Resp./Cross-Appeal Br. to AID at 30 (citing CP at 1040 (Yakama Nation CFO)); RCW 90.22.010, .030 ("The establishment of levels and flows pursuant to RCW 90.22.010 shall in no way affect existing water and storage rights and the use thereof .").

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

"essentially requires AID to dewater Bachelor and Hatton Creeks." Br. for AID at 13. But AID does not provide any authority or citation for a water right to "rehydrate" the creeks or how it is different from the nondiversionary stockwater right it seeks. Further, this is specifically where AID argues that *Ahtanum* I and II did not adjudicate water rights outside of irrigation season. As discussed above, this is not the case.

The Yakama Nation urges this court to disregard the assertion of a right to "rehydrate" the creek as AID does not support the assertion of the right. Yakama Nation's Resp./Cross-Appeal Br. to AID at 34 (citing *In re Registration of Elec. Lightwave, Inc.*, 123 Wn.2d 530, 545, 869 P.2d 1045 (1994) ("An appellate court need not decide a contention not supported by citation to authority.")). Further, when AID urged the trial court that northside users were entitled to "'recharge its conveyance facilities'" in early spring, the court gave AID the opportunity to provide evidence of this right. CP at 6732. "That evidence was not provided." *Id*. AID provided certificates indicating that irrigation season began April 1, but did not provide any evidence of beneficial use of the water by its patrons. *Id*. at 6733. AID failed to show that it is entitled to any separate right to rehydrate Bachelor and Hatton Creeks such that it should be allowed to keep the headgates open outside of irrigation season.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

We hold that AID is not entitled to open the Bachelor and Hatton Creeks headgates to rehydrate the creeks because it has not established a water right that would allow for such use. Further, as discussed above, even if it had established a water right, it would be junior to the Yakama Nation's senior right to all waters of Ahtanum Creek outside of irrigation season.

B. Water duty was adjudicated in *Ahtanum* II and is binding on this adjudication

AID contends that the superior court "improperly limited AID patrons' water duty" because it "improperly relied on the federal *Ahtanum* litigation to conclude that the issue of water duty had already been decided." Br. for Appellant AID at 15. In contrast, the United States and the Yakama Nation both contend that *Ahtanum* II did quantify AID patrons' water duty. *See* Yakama Nation's Resp./Cross-Appeal Br. to AID at 45; U.S.' Br. in Resp. to AID at 46-47. We agree with the Yakama Nation and the United States.

As noted above in footnote 4,

"[Water duty] [is] that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon. It is not a hard and fast unit of measurement, but is variable according to conditions."

*Dep't of Ecology v. Grimes*, 121 Wn.2d 459, 469, 852 P.2d 1044 (1993) (first alteration in original) (quoting *In re Application of Water Rights of Steffens*, 756 P.2d 1002, 1005-06 (Colo. 1988)).

54

This court held, and reiterated multiple times in *Acquavella* V, that the federal *Ahtanum* cases were an adjudication of the northside users' water rights. In *Ahtanum* I, the Ninth Circuit remanded to the trial court for the northside users to set forth their claims to the waters of Ahtanum Creek. 236 F.2d at 339, 341-42. In *Ahtanum* II, the Ninth Circuit explained that on remand the northside users

> filed numerous answers setting forth, as we had directed, "who these water users are, the lands they claim to have the right to irrigate, and how they deraigned their titles to any water rights," and generally set forth their claims to water rights in the stream as to the various dates of acquisition.

330 F.2d at 900. They called witnesses and gave testimony as to the use of the Ahtanum Creek waters. *Id*. at 901. The court appointed a special master, and the special master determined "that the duty of water for supplying these lands was 1/2 miner's inch per acre during the irrigation season." *Id*. at 903. The special master then calculated the "allowable diversion requirements" of the northside users to be 57.18 cfs. *Id*. The Ninth Circuit ultimately determined the total diversion allowed to be 46.96 cfs. *Id*. at 915.

AID repeatedly contends both that it "did not have notice that the issue of water duty would be litigated" and that "*Ahtanum* II court did not allow claimants to litigate the issue" of water duty. Br. for Appellant AID at 15. However, it provides no evidence or citation that this is the case and, instead, cites to memoranda in the record that, when describing the *Ahtanum* case law, does not refer to the rulings on

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

water duty. *See id*. at 15-16 (citing CP at 2018-19 (Report of Ct. Concerning Water Rights for Subbasin No. 23 (Ahtanum Creek)), 3414-15 (Mem. Op. Re: Ahtanum Creek Threshold Legal Issues)). It is unclear how, on a remand to determine water rights of the northside users, AID was unaware that water duty (or the quantification of the northside users rights) was at issue in the case. Regardless, what remains is that the *Ahtanum* litigation determined the water duty, and *Acquavella* V determined that *Ahtanum* II was an adjudication of water rights.

AID further argues that the *Ahtanum* II court indicated that Washington was in a better position to adjudicate water rights claims under state law. *Id*. at 16 (citing *Ahtanum* II, 330 F.2d at 911-12). While the Ninth Circuit did indicate that Washington has an established system and "[a] federal district court is not necessarily possessed of any better machinery," it nonetheless adjudicated the rights. *Ahtanum* II, 330 F.2d at 911-12. That federal adjudication is binding on this one.

C.  Conveyance loss is included in water duty and, therefore, was also adjudicated in *Ahtanum* II

AID also contends that the superior court "improperly denied AID's claim for conveyance water" and that it has a greater loss because it is not a piped district. Br. for Appellant AID at 14.  In contrast, both the Yakama Nation and the United States contend that conveyance loss is also precluded by *Ahtanum* II as part of the

56

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

quantification of the water rights in that case.[15] Yakama Nation's Resp./Cross-Appeal Br. to AID at 47-48, U.S.' Br. in Resp. to AID at 44. We agree with the Yakama Nation and the United States and hold that conveyance loss is a part of water duty and was thus adjudicated in *Ahtanum* II.

In *Acquavella* V, this court reiterated that as part of the *Ahtanum* litigation, the northside users were required to show that the water "was beneficially applied to the land." 177 Wn.2d at 326. Beneficial use includes an analysis of the purpose of the water and the measure of the water right. *Grimes*, 121 Wn.2d at 468. To determine the measure of water for beneficial use, the court looks to water duty and waste. *Id*. In terms of waste, "[w]hile an appropriator's use of water must be reasonably efficient, absolute efficiency is not required." *Id*. at 472. Reasonable efficiency thus allows for some conveyance loss. *Id*.

In *Grimes*, this court indicated that conveyance loss is part of water duty. We noted that the referee in that case "applied an efficiency factor [to the amount of water needed to irrigate] and increased this water duty to 2.5 acre feet per acre per year." *Id.* at 470. Further, we held there was sufficient evidence for the referee to have "confirmed in the Grimeses a water right with one-fourth conveyance loss for

---

[15] The United States also argues that AID did not raise the issue below and, therefore, is precluded from bringing the issue on appeal. U.S.' Br. in Resp. to AID at 43 (citing *State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84 (2011)); *see also* RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court.). AID does not indicate where in the record it raised this issue.

a total of 1.5 cubic feet per second." *Id*. at 472-73. Therefore, it follows that conveyance loss is part of the water right and can be determined as part of the water duty. The Ninth Circuit has also opined that "[t]he major conceptual tool for implementing beneficial use is the water duty, which is the amount of water an appropriator is entitled to use, *including a margin for conveyance loss*." *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 854 (9th Cir. 1983) (emphasis added).

We thus hold that because water duty includes conveyance loss, the conveyance loss was adjudicated in *Ahtanum* II.

CONCLUSION

We reverse in part and affirm in part as follows. We hold that parties *may* appeal a partial final judgment under RAP 2.2(d) and CR 54(b), but because it is permissive, a failure to do so does not make an appeal from the actual final judgment untimely. We hold that res judicata does not bar AID from appealing issues in the final decree not previously appealed in the Ahtanum CFO. We hold that the Yakama Nation Appeal is timely because the parties are not appealing the Yakama Nation CFO but, instead, are appealing a conflict between the FSOR and the Yakama Nation CFO.

We reverse the superior court's acreage limits on the Yakama Nation's water rights to divert water within the Project and remand to strike said limits.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

We reverse the superior court's quantifications of conveyance loss as to RDA, and remand for proper quantification using Dr. Maddox's expert testimony.

We affirm the superior court's holding that AID is not permitted to open the Bachelor and Hatton Creeks headgates outside of irrigation season because of the Yakama Nation's senior water right to all of the waters of Ahtanum Creek pursuant to the adjudication in *Ahtanum* II. However, we reverse the superior court and hold that AID has a junior, nondiversionary stockwater right to the waters of Ahtanum Creek that would naturally flow in Bachelor and Hatton Creeks with the headgates open. This right, however, is junior to the Yakama Nation's water right, and AID cannot open the headgates to exercise this right if it would interfere with the Yakama Nation's senior water right.

We affirm the superior court's holding as to the conclusion that water duty was litigated and adjudicated in *Ahtanum* II. And finally, we affirm the superior court's denial of conveyance loss to AID as conveyance loss is a part of water duty and the water rights adjudicated in *Ahtanum* II.

59

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Dep't of Ecology v. Acquavella, et al.*, No. 99373-4

Whitener, J.

WE CONCUR:

González, C.J.

Stephens, J.

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Yu, J.

Owens, J.

Montoya-Lewis, J.